19-2395-ag (L)
New York, et al. v. National Highway Traffic Safety Administration, et al.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019
Nos. 19-2395-ag (L), 19-2508-ag (CON)

STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF MAINE, NATURAL RESOURCES DEFENSE COUNCIL, INC., SIERRA CLUB,
*Petitioners*,

*v.*

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, JAMES C. OWENS, in his capacity as Acting Administrator of the National Highway Traffic Safety Administration, ELAINE CHAO, in her capacity as Secretary of the United States Department of Transportation,
*Respondents*,

ALLIANCE FOR AUTOMOTIVE INNOVATION,
*Intervenor*.[*]

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Petition for Review of Agency Rulemaking

ARGUED: JUNE 1, 2020
DECIDED: AUGUST 31, 2020

Before: SULLIVAN, PARK, and NARDINI, *Circuit Judges*.

The petitioners ask this Court to vacate a final rule published by the National Highway Traffic Safety Administration ("NHTSA") on July 26, 2019, which reversed the agency's 2016 increase to the base rate of the Corporate Average Fuel Economy ("CAFE") penalty. They argue that NHTSA erroneously concluded that the Federal Civil Penalties Inflation Adjustment Act Improvements Act (the "Improvements Act") is inapplicable to the CAFE penalty because it is not a "civil monetary penalty" as that term is defined by statute. They also contend that NHTSA improperly reconsidered the merits of the CAFE penalty increase by evaluating its economic effects. We hold that (1) the CAFE penalty is a civil monetary penalty under the Improvements Act and (2) NHTSA's reconsideration of the economic effects of its initial rule was untimely and therefore unauthorized. We therefore GRANT the petitions for review and VACATE the rule.

STEVEN C. WU (Attorney General Letitia James, Solicitor General Barbara D. Underwood, Yueh-Ru Chu, on the brief), New York, NY, *for Petitioner State of New York*.

Attorney General Xavier Becerra, David Zaft, David A. Zonana, Laura J. Zuckerman,

2

Los Angeles, CA, *for Petitioner State of California*.

Attorney General William Tong, Matthew I. Levine, Hartford, CT, *for Petitioner State of Connecticut*.

Attorney General Karl A. Racine, Jacqueline R. Bechara, Washington, DC, *for Petitioner District of Columbia*.

Attorney General Kathleen Jennings, Kayli H. Spialter, Wilmington, DE, *for Petitioner State of Delaware*.

Attorney General Kwame Raoul, Bridget DiBattista, Matthew J. Dunn, Jason E. James, Daniel I. Rottenberg, Chicago, IL, *for Petitioner State of Illinois*.

Attorney General Aaron M. Frey, Laura Jensen, Augusta, ME, *for Petitioner State of Maine*.

Attorney General Brian E. Frosh, Joshua M. Segal, Roberta R. James, Baltimore, MD, *for Petitioner State of Maryland*.

Attorney General Maura Healey, Christophe Courchesne, Carol Iancu, Matthew Ireland, David S. Frankel, Megan M. Herzog, Boston, MA, *for Petitioner Commonwealth of Massachusetts*.

Attorney General Gurbir S. Grewal, Jeremy M. Feigenbaum, Trenton, NJ, *for Petitioner State of New Jersey*.

Attorney General Ellen F. Rosenblum, Paul Garrahan, Salem, OR, *for Petitioner State of Oregon*.

Attorney General Thomas J. Donovan, Jr., Laura B. Murphy, Montpelier, VT, *for Petitioner State of Vermont*.

Attorney General Peter F. Neronha, Tricia K. Jedele, Providence, RI, *for Petitioner State of Rhode Island*.

Attorney General Robert W. Ferguson, Emily C. Nelson, Olympia, WA, *for Petitioner State of Washington*.

IAN FEIN (Alexander L. Tom, Gabriel Daly, on the brief), Natural Resources Defense Council, San Francisco, CA, *for Petitioner Natural Resources Defense Council*.

Vera Pardee, Law Offices of Vera Pardee, Berkeley, CA, *for Petitioner Sierra Club*.

DENNIS FAN (Steven G. Bradbury, Paul M. Geier, Jonathan C. Morrison, Kerry E. Kolodziej, Joseph H. Hunt, H. Thomas Byron III, on the brief), Washington, DC, *for Respondents*.

Ashley C. Parrish, Jacqueline Glassman, King & Spalding LLP, Washington, DC, Andrew J. Chinsky, King & Spalding LLP, Chicago IL, Erika Z. Jones, Daniel E. Jones, Mayer Brown LLP, Washington, DC, *for Intervenor Alliance for Automotive Innovation*.

Richard L. Revesz, Bethany A. Davis Noll, Max Sarinsky, Jason A. Schwartz, New York University School of Law, New York, NY, *for The Institute for Policy Integrity at New York University School of Law as Amicus Curiae in support of Petitioners.*

Joseph Mendelson III, Arlington, VA, *for Tesla, Inc. as Amicus Curiae in support of Petitioners.*

WILLIAM J. NARDINI, *Circuit Judge*:

During the oil crisis of the 1970s, Congress created a system of fuel economy standards for automobiles to boost fuel efficiency and drive down American dependence on foreign energy supplies. To promote those Corporate Average Fuel Economy ("CAFE") standards, Congress exposed automobile manufacturers to penalties if their annual fleets fell short of the mark. Congress first set the penalty at $5 for every tenth of a mile per gallon ("mpg") below the standard, multiplied by the number of cars in a manufacturer's fleet, subject to certain offsets.

Inflation, however, can take the bite out of fines. In recognition of this basic economic phenomenon, Congress enacted laws in 1990, 1996, and 2015

to identify civil monetary penalties that were losing ground to inflation and to periodically update them to catch up with the Consumer Price Index. After the first act, the National Highway Traffic Safety Administration ("NHTSA") and the Office of Management and Budget ("OMB") identified the CAFE penalty as among those to be adjusted. Following the 1996 law, NHTSA engaged in rulemaking that increased the CAFE penalty rate from $5 to $5.50, and then, following the 2015 law, to $14.

NHTSA shifted gears, however, starting in 2017. First, it indefinitely delayed implementation of the increase to $14. Acting on a petition for review, this Court held that the delay violated NHTSA's statutory authority and that the increase was therefore in effect for the 2019 model year.[1] In 2019, following our decision, NHTSA issued a final rule that rolled back the penalty to $5.50 on the theory that the inflation-adjustment laws do not

---

[1] *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.* ("*NRDC v. NHTSA*"), 894 F.3d 95, 100, 107–08, 115–16 (2d Cir. 2018).

apply to the CAFE penalty in the first place, and that even if they did, an increase would be unwarranted as a matter of economic policy.

Following this latest move by NHTSA, we are presented with petitions for review that require us to answer two questions of statutory construction: (1) whether the penalty for violating the CAFE standards is a "civil monetary penalty" as defined in these inflation-adjustment laws; and, if so, (2) whether these laws authorized NHTSA to reconsider, in 2019, the 2016 catch-up inflation adjustment based on its economic effects. We hold that the CAFE penalty is a "civil monetary penalty" and that NHTSA's reversal of the catch-up adjustment was untimely. Accordingly, we grant the petitions for review and vacate NHTSA's final rule reversing the CAFE penalty increase.

## I.   Background

In 1975, Congress enacted the Energy Policy and Conservation Act ("EPCA"), which, among other things, created the CAFE standards. [2] Congress delegated authority to administer these standards to the Secretary of Transportation,[3] who then, in turn, delegated that authority to NHTSA.[4] For each model year, NHTSA establishes the CAFE standards as separate "fuel economy targets for different categories of vehicles, measured in miles per gallon."[5] If a manufacturer fails to meet the model year target for a given category of vehicles, it is subject to a penalty assessed by multiplying

---

[2] Pub. L. No. 94-163, § 301, 89 Stat. 871, 901–16 (1975) (codified as amended at 49 U.S.C. §§ 32901–32919). EPCA's CAFE provisions were initially codified in Title 15 of the United States Code. In 1994, Congress collected and recodified transportation laws, including the CAFE provisions, in Title 49. Revision of Title 49, United States Code Annotated, "Transportation," Pub. L. No. 103-272, 108 Stat. 745, 1056–76 (1994).

[3] 49 U.S.C. § 32902(a).

[4] 49 C.F.R. § 1.95(a).

[5] *NRDC v. NHTSA*, 894 F.3d at 101; *see also* 49 U.S.C. § 32902(b). As relevant to the CAFE penalty, the categories of vehicles are passenger automobiles and non-passenger automobiles. 49 U.S.C. § 32902(b).

the base penalty rate — which Congress initially pegged at $5[6] — by the amount the manufacturer falls short, as measured by each tenth of an mpg that the manufacturer's fleet-wide average mpg is below the standard, multiplied by the number of vehicles in that fleet.[7] A manufacturer can reduce its shortfall in compliance by applying "credits," which may be earned when a fleet's average mpg exceeds the CAFE standard for a given model year or purchased from another manufacturer.[8] EPCA authorizes NHTSA to make discretionary increases to the base penalty rate if it finds that certain factors have been met,[9] but NHTSA has never acted under this authority.

---

[6] Pub L. No. 94-163, § 301, 89 Stat. 871, 913.

[7] 49 U.S.C. § 32912(b).

[8] *Id.* §§ 32903(a), 32912(b). A manufacturer may obtain credits by rolling them over from years in which it exceeds the applicable CAFE standard, *id.* § 32903(a); transferring them from a compliant fleet to a noncompliant fleet, *id.* § 32903(g); purchasing them from compliant manufacturers, *id.* § 32903(f); or proving to the Secretary of Transportation that it is likely to earn enough credits in the next three years to make up for the deficiency in the current model year, *id.* § 32903(b).

[9] *Id.* § 32912(c)(1)(A) (delegation to Secretary); 49 C.F.R. § 1.95(a) (delegation to NHTSA).

In 1990, Congress passed the Federal Civil Penalties Inflation Adjustment Act ("Inflation Adjustment Act") to study whether inflation had diminished the efficacy of "civil monetary penalties," which Congress defined as penalties that are (a) either "for a specific monetary amount" or having "a maximum amount" and (b) "assessed or enforced by an agency pursuant to Federal law." [10] This law effectively mandated a research exercise, requiring the executive branch to submit annual reports to Congress about existing civil monetary penalties. [11] In July 1991, OMB submitted a compilation of civil monetary penalties reported by 41 federal agencies. In that list, NHTSA identified the CAFE penalty as fitting the statutory definition of civil monetary penalty. [12]

---

[10] Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, §§ 2(a), 3(2), 104 Stat. 890, 890.

[11] *Id.* § 4, 104 Stat. at 891.

[12] OFF. OF MGMT. & BUDGET, CIVIL MONETARY PENALTY ASSESSMENTS AND COLLECTIONS: 1990 REPORT TO CONGRESS AND CIVIL MONETARY PENALTY INFLATION ADJUSTMENT REPORT Ex. 1 at 25, Ex. 2 at 25 (1991).

Congress amended the Inflation Adjustment Act in 1996 to mandate inflation-related adjustments to "civil monetary penalties," as defined by the Inflation Adjustment Act.[13] It directed agencies to adjust each of their civil monetary penalties for inflation within six months and to continue doing so "at least once every four years thereafter."[14] Importantly, however, the initial adjustment was capped at 10% of the penalty's base amount.[15] In 1997, pursuant to this amendment, NHTSA increased the base rate for the CAFE penalty from $5 to $5.50 — the maximum permitted adjustment.[16] In doing so, NHTSA concluded (as it had in 1991) that the CAFE penalty was a civil monetary penalty under the Inflation Adjustment Act. NHTSA did

---

[13] Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. 1321, 1321-373.

[14] *Id.*

[15] *Id.* § 31001(s)(2), 110 Stat. at 1321-373.

[16] Civil Penalties, 62 Fed. Reg. 5,167, 5,168 (Feb. 4, 1997). Absent the cap, the calculations required in the 1996 amendments would have resulted in an increase to a $15 base penalty rate. Pub. L. No. 104-134, § 31001(s)(2), 110 Stat. at 1321-373.

not make further increases to the base penalty rate under this authority, because the statute's rounding procedure effectively precluded them.[17]

In 2015, Congress further amended the Inflation Adjustment Act through the enactment of the Federal Civil Penalties Inflation Adjustment Act Improvements Act (the "Improvements Act"), which required new inflation adjustments and eliminated the provisions that had prevented certain increases.[18]  Like its predecessors, the Improvements Act added language referencing "civil monetary penalties," leaving the definition in the Inflation Adjustment Act unaltered.[19]

---

[17]  Inflation Adjustment Act § 5(a), 104 Stat. at 891 (requiring that inflation adjustments under the Inflation Adjustment Act "be rounded to the nearest . . . multiple of $10 in the case of penalties less than or equal to $100").  In the years following the increase to $5.50 in 1997, inflation was never high enough to require an increase larger than $5.  Thus, when rounded to the nearest multiple of $10, the required calculation always zeroed out.

[18]  Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599–600 (hereinafter "Improvements Act").

[19]  *Id.*

12

The Improvements Act's method for calculating inflation adjustments, however, differed from the previous method in two key ways. First, it replaced the requirement that agencies calculate inflation adjustments based on the year in which the penalty was last adjusted with a requirement that adjustments be calculated based on the year that the penalty "was established . . . or last adjusted *other than pursuant to the Inflation Adjustment Act*."[20] Second, it changed the rounding rules. Instead of rounding increases to the nearest $10 figure, it now rounded to the nearest $1.[21] The Improvements Act required that all federal agencies responsible

---

[20] Civil Penalties, Interim Final Rule, 81 Fed. Reg. 43,524, 43,525 (July 5, 2016) (emphasis added); *compare* Improvements Act § 701(b)(2)(B), 129 Stat. at 600 (amending the Inflation Adjustment Act to calculate the percentage change for inflation based on "the amount of the civil monetary penalty as it was *most recently established or adjusted under a provision of law other than this Act*" (emphasis added)), *with* Inflation Adjustment Act § 5(b), 104 Stat. at 891–92 (calculating the percentage change for inflation based on the difference between "the Consumer Price Index for the month of June of the calendar year preceding the adjustment" and "the Consumer Price Index for the month of June of the calendar year in which the amount of such civil monetary penalty *was last set or adjusted pursuant to law*" (emphasis added)). As relevant to the CAFE penalty, this provision of the Improvements Act changed the beginning calculation date for inflation from 1997 to 1975.

[21] Improvements Act § 701(b)(2)(A), 129 Stat. at 600 (codified at 28 U.S.C. § 2461 note sec. 5(a)).

13

for administering civil monetary penalties make an initial "catch-up" inflation adjustment to those penalties by July 1, 2016, and annual inflation adjustments thereafter.[22] Agencies were instructed to calculate the catch-up adjustment by multiplying each civil monetary penalty amount by the "percentage . . . by which the Consumer Price Index for the month of October, 2015 exceed[ed] the Consumer Price Index for the month of October of the calendar year during which the amount of such civil monetary penalty was established or adjusted under a provision of law other than [the Inflation Adjustment Act]."[23] The Improvements Act capped the initial adjustment at 150% of the existing penalty.[24]

---

[22] Improvements Act § 701(b)(1)(A), 129 Stat. at 599 (codified at 28 U.S.C. § 2461 note sec. 4). The catch-up adjustments were to be made through an interim final rulemaking, published by July 1, 2016, and to go into effect no later than August 1, 2016. *Id*. § 701(b)(1)(D), 129 Stat. at 599 (codified at 28 U.S.C. § 2461 note sec. 4(b)(1)(A)–(B)).

[23] Improvements Act § 701(b)(2)(B), 129 Stat. at 600 (codified at 28 U.S.C. § 2461 note sec. 5(b)(2)(A)).

[24] Improvements Act § 701(b)(2)(B), 129 Stat. at 600 (codified at 28 U.S.C. § 2461 note sec. 5(b)(2)(C)).

14

Though an agency was permitted to apply a lower catch-up adjustment than otherwise called for by the Improvements Act, it could do so only if (1) the head of the agency found that increasing the penalty by the otherwise required amount would create a "negative economic impact" or result in "social costs" that "outweigh[ed] the benefits" of the required increase, and (2) OMB concurred in those findings.[25] OMB required that agencies making such findings submit notice to OMB "no later than May 2, 2016."[26]

On July 5, 2016, pursuant to the Improvements Act, NHTSA published an interim final rule increasing the base rate of the CAFE penalty from $5.50 to $14, following the statutory formula for the catch-up

---

[25] Improvements Act § 701(b)(1)(B), 129 Stat. at 599-600 (codified at 28 U.S.C. § 2461 note sec. 4(c)(1)–(2)).

[26] Guidance Letter from Office of Management and Budget, at 3 (Feb. 24, 2016), whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2016/m-16-06.pdf.

15

adjustment.[27]  The interim final rule provided that the new rate would take effect on August 4, 2016.[28]

On December 28, 2016, NHTSA issued a revised final rule that confirmed the increase to $14.[29]  In response to requests from industry organizations, however, "NHTSA determined that it would not apply the new penalty rates retroactively and would instead delay the implementation of the [higher] penalty rate until model year 2019."[30]

Following the change in administrations, NHTSA temporarily delayed implementation of the new base penalty rate several times before

---

[27] 81 Fed. Reg. at 43,526.  The formula for the required adjustment yielded a base penalty rate of $22, but the 150% cap limited the increase to $13.75, which was then "rounded to the nearest multiple of $1": $14.  *See* 28 U.S.C. § 2461 note sec. 5, 81 Fed. Reg. at 43,526.

[28] 81 Fed. Reg. at 43,524.  NHTSA also applied the Improvements Act's inflation calculation to a provision in EPCA that allowed the Secretary of Transportation to increase the base penalty rate under EPCA, upon making certain findings, subject to a cap of $10. *See* 49 U.S.C. § 32912(c)(1)(B); 81 Fed. Reg. at 43,526.  The inflation adjustment raised this cap to $25.  81 Fed. Reg. at 43,526.

[29] Civil Penalties, Final Rule, 81 Fed. Reg. 95,489 (Dec. 28, 2016).

[30] *NRDC v. NHTSA*, 894 F.3d at 102; *see also* 81 Fed. Reg. at 95,490–91.

extending the delay indefinitely.[31] The agency issued a final rule (the "Suspension Rule") announcing that it intended to reconsider the penalty increase and soliciting public comments on what an appropriate adjustment might be.[32] A group of states and environmental organizations sought review of that delay in this Court.[33] In an opinion issued on June 29, 2018, we vacated the Suspension Rule, holding that NHTSA had "exceeded its statutory authority in indefinitely delaying" the rule increasing the base penalty rate to $14 for the 2019 model year.[34] The penalty increase rule, we stated, was "now in force."[35]

---

[31] *See* Civil Penalties, 82 Fed. Reg. 8,694 (Jan. 30, 2017) (initially delaying effective date to March 28, 2017); Civil Penalties, 82 Fed. Reg. 15,302 (Mar. 28, 2017) (extending delay to June 26, 2017); Civil Penalties, 82 Fed. Reg. 29,009 (June 27, 2017) (extending delay to July 10, 2017); Civil Penalties, 82 Fed. Reg. 32,139 (July 12, 2017) (extending delay "indefinitely pending reconsideration").

[32] 82 Fed. Reg. at 32,139, 32,139–40.

[33] *See NRDC v. NHTSA*, 894 F.3d at 100.

[34] *Id.* at 107–08.

[35] *Id.* at 116.

NHTSA responded not by implementing the new rate, but instead by reconsidering whether the Improvements Act applied to the CAFE penalty at all.[36] On July 26, 2019, it issued a final rule (the "2019 Final Rule") reversing the inflation adjustment to the CAFE penalty from $14 back to $5.50 based on its conclusion that the CAFE penalty is not a "civil monetary penalty" within the Improvements Act's definition.[37] Even if the Improvements Act applied, NHTSA added, the "negative economic impact" that any increase in the CAFE penalty would create was sufficient to support reversing the increase.[38] In an informal letter, OMB concurred

---

[36] Civil Penalties, Final Rule, 84 Fed. Reg. 36,007, 36,007–08, 36,012 (July 26, 2019).

[37] *Id.* at 36,012, 36,015. Notwithstanding its conclusion that the CAFE penalty was not a "civil monetary penalty" under the definition that applies in the Inflation Adjustment Act, that act's amendments, and the Improvements Act, NHTSA explained that due to "practical and legal issues," it was not reversing its previous inflation adjustment (made pursuant to the Inflation Adjustment Act in 1997) and going back to EPCA's original rate of $5. It noted it was considering a "separate rulemaking" about whether to take that step. *Id.* at 36,013 & n.41.

[38] *Id.* at 36,009, 36,013.

18

with NHTSA's conclusion that the Improvements Act did not apply to the CAFE penalty.[39]

A group of states and the District of Columbia (the "States") and two non-governmental organizations, the Natural Resources Defense Council and the Sierra Club (the "NGOs"), filed timely petitions for review of the 2019 Final Rule. We consolidated the cases, and the Alliance for Automotive Innovation intervened based on the interests of its members.

## II.    Discussion

This Court reviews an agency's final action under the Administrative Procedure Act.[40] We will "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[39] Off. of Mgmt. & Budget, Exec. Off. of the President, Opinion Letter (July 12, 2019).

[40] 5 U.S.C. § 706.

accordance with law"; that is "in excess of statutory . . . authority"; or that

is "without observance of procedure required by law."[41]

The States and NGOs argue that NHTSA's reversal of the 2016

penalty increase is unlawful because the CAFE penalty is a civil monetary

penalty under the Improvements Act, and because the Act did not permit

agencies to reconsider the effects of their inflation adjustments once certain

statutory time frames had passed.[42]  We examine each contention in turn.

**A. The CAFE penalty is a "civil monetary penalty."**

We begin, as in all "statutory interpretation disputes, . . . [with] a

careful examination of the ordinary meaning and structure of the law

itself." [43]   To assess "ordinary meaning," we consider the commonly

---

[41]  *Id.* § 706(2); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983); *NRDC v. NHTSA*, 894 F.3d at 107.

[42]  NHTSA does not argue that the States and NGOs lack standing to challenge NHTSA's reversal of the CAFE penalty increase.  Nor could it under our holding in *NRDC v. NHTSA*, 894 F.3d at 103–05, that the petitioners had standing on the basis of declarations very similar — and in some instances identical — to those submitted in this case.

[43]  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).

understood meaning of the statute's words "at the time Congress enacted the statute,"[44] and "with a view to their place in the overall statutory scheme."[45] If the meaning is unambiguous, that is the end of our inquiry. "[O]nly when a statute's text is ambiguous [may] we turn to other tools of statutory interpretation to help clarify the ambiguity."[46]

In this case, the phrase of critical importance is "civil monetary penalty," as used in the Improvements Act. If the CAFE penalty is not a "civil monetary penalty," then NHTSA is correct that the Improvements Act did not mandate the increase to a $14 base penalty rate. If, on the other hand, the CAFE penalty is a "civil monetary penalty," then NHTSA was required to apply the Improvements Act and adjust the penalty rate accordingly (unless, of course, one of the Act's exceptions apply).

---

[44] *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (cleaned up).

[45] *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (cleaned up).

[46] *Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 408 (2d Cir. 2019).

As a preliminary matter, we agree with NHTSA that we did not decide whether the CAFE penalty is a "civil monetary penalty" in *NRDC v. NHTSA*, for the simple reason that the question was not presented to us for decision. Our pronouncements in that case about the mandatory nature of the timing in the Improvements Act assumed, without deciding, that the Act applied to the CAFE penalty.[47] Because we "have not [previously] decided that the statutory language at issue in this case . . . is unambiguous," this question is not water under the bridge.[48]

The statutory definition of "civil monetary penalty" is our starting point:

> (2) "civil monetary penalty" means any penalty, fine, or other sanction that —
>
> > (A)    (i) is for a specific monetary amount as provided by Federal law; or

---

[47]  *See generally* 894 F.3d 95.

[48]  *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 510 (2d Cir. 2017).

22

(ii) has a maximum amount provided for by Federal law; and

(B) is assessed or enforced by an agency pursuant to Federal law; and

(C) is assessed or enforced pursuant to an administrative proceeding or a civil action in the Federal courts . . . .[49]

EPCA, in turn, defines the CAFE penalty as follows:

(b) Penalty for manufacturer violations of fuel economy standards. — Except as provided in subsection (c) of this section, a manufacturer that violates a standard prescribed for a model year under section 32902 of this title is liable to the Government for a civil penalty of $5 multiplied by each .1 of a mile a gallon by which the applicable average fuel economy standard under that section exceeds the average fuel economy —

(1) calculated under section 32904(a)(1)(A) or (B) of this title for automobiles to which the standard applies manufactured by the manufacturer during the model year;

(2) multiplied by the number of those automobiles; and

(3) reduced by the credits available to the manufacturer under section 32903 of this title for the model year.[50]

---

[49] 28 U.S.C. § 2461 note sec. 3(2).

[50] 49 U.S.C. § 32912(b).

23

It is undisputed that the CAFE penalty is "assessed and enforced by an agency" (NHTSA) "pursuant to Federal law" (EPCA), as required by subsection (2)(B) of the Improvements Act, and that the CAFE penalty is "assessed or enforced pursuant to an administrative proceeding or a civil action in the Federal courts," as required by subsection (2)(C).[51] The inquiry therefore turns on whether the CAFE penalty is "for a specific monetary amount" under subsection (2)(A).[52] We conclude that it is.

As relevant here, the base rate used to calculate the CAFE penalty is very specific, and it is framed in terms of a particular monetary amount: It is a fixed dollar figure, which Congress originally established at $5 when it enacted EPCA, and which NHTSA later increased by rulemaking to $5.50 and later to $14. Although the dollar figure has been updated twice, it has

---

[51] 28 U.S.C. § 2461 note sec. 3.

[52] The petitioners also argue that the CAFE penalty satisfies subsection (2)(A)(ii) because it "has a maximum amount provided for by Federal law." Because we hold that the CAFE penalty is "for a specific amount" under subsection (2)(A)(i), we need not reach that argument.

always been clearly identified and has never been ambiguous. Moreover, the base rate is just that — a fixed dollar rate that is used as a multiplier to determine the overall penalty to be assessed against a noncompliant manufacturer. The fact that the CAFE penalty's base rate is what NHTSA describes as "an input in a formula"[53] does not exclude it from the Improvements Act's definition of a "civil monetary penalty." A penalty can be "specific" if it is based on a rate with an identified dollar amount; and the use of a rate necessarily implies that the rate will be multiplied by something.

This interpretation comports with how other agencies have consistently construed the Improvements Act to apply to civil monetary penalties that are calculated using formulas, including by multiplying a particular dollar amount by some other ascertainable figure, such as the

---

[53] NHTSA Br. at 24.

25

number of violations, days in violation, or units in violation.[54] Thus, even assuming that NHTSA is correct that the CAFE penalty should be conceptualized as the total amount for which a manufacturer is liable after conducting all the calculations set forth in § 32912(b), that final amount is still based on a fixed-dollar multiplier and is therefore "for a specific monetary amount."

That manufacturers can lower a penalty amount by applying credits does not change our assessment. Under EPCA, credits are not a means of

---

[54] *See, e.g.*, Civil Monetary Penalty Adjustments for Inflation, 81 Fed. Reg. 42,987, 42,994 (July 1, 2016) (Department of Homeland Security increasing, pursuant to the Improvements Act, the baseline penalty for discharge of oil or a hazardous substance in violation of 33 U.S.C. § 1321(b)(7)(D) from $4,000 to $5,345 "per barrel of oil or unit discharged," as listed in 33 C.F.R. § 27.3); Civil Monetary Penalty Adjustments for Inflation, 84 Fed. Reg. 13,499, 13,510 (Apr. 5, 2019) (Department of Homeland Security increasing, pursuant to the Improvements Act, the base penalty rate for towing vessels in violation of 46 U.S.C. § 55111 from "$60 per ton of the towed vessel" to "$159 per ton of the towed vessel," as listed in 19 C.F.R. § 4.92); Civil Monetary Penalties Inflation Adjustment, 81 Fed. Reg. 41,196, 41,197, 41,199–200 (June 24, 2016) (Federal Election Commission increasing, pursuant to the Improvements Act, the base figures for the penalties in 11 C.F.R. § 111.43, which are calculated by selecting the applicable base penalty amount based on the level of monetary activity involved, adding that base dollar figure to the product of a base penalty rate multiplied by the number of days that a late-filed report was overdue, and multiplying this sum by the product of a calculation based on the number of previous violations).

paying a penalty, but are themselves a method of complying with the CAFE standard. The statute states that "[c]ompliance is determined *after* considering credits available to the manufacturer under section 32902 of this title."[55] In § 32912(b), overcompliance with the CAFE standards (which a manufacturer may earn or purchase from another manufacturer) is netted out against undercompliance, yielding what is effectively a total net violation. It is this total net violation that is multiplied by the CAFE base penalty rate to yield the aggregate penalty. Credits are therefore just one more input in the CAFE penalty formula, not unlike the number of vehicles in a manufacturer's fleet or a manufacturer's mpg shortfall. Accordingly, this credit system does not push the CAFE penalty beyond the Improvements Act's reach.

Context provides additional support for our reading.[56] The statutory purpose of the Improvements Act is to adjust civil monetary penalties to

---

[55] 49 U.S.C. § 32911(b) (emphasis added).

[56] *See Nat'l Ass'n of Home Builders*, 551 U.S. at 666.

keep pace with inflation.[57]  Whether a statute describes a penalty as a standalone dollar figure or as a dollar amount to be multiplied by other factors, that penalty will lose value over time as inflation creeps up.[58]  And regardless of whether the dollar figure is to be multiplied by the number of violations, days of violation, or some other increment of noncompliance, it remains equally vulnerable to inflation – and therefore equally suited to indexing for inflation. For these reasons, the CAFE penalty is a "civil monetary penalty" under the Improvements Act.[59]

---

[57] *See* Improvements Act § 701, 129 Stat. at 599–600.

[58]  NHTSA argues that the CAFE penalty has not been weakened by inflation because periodic increases to the fuel efficiency targets have increased the monetary value of the penalty over time.  This argument, however, fails to recognize that the fuel efficiency targets are designed to keep pace with scientific feasibility rather than inflation.  *See* 49 U.S.C. § 32902.  Keeping scientific feasibility constant, the CAFE penalty has indeed lost ground to inflation because the base rate has been the same since 1997.  And while the 2019 Final Rule also points out that the penalty per gallon of gas consumed will increase as vehicles become more fuel efficient, 84 Fed. Reg. at 36,018, it is for Congress (not NHTSA) to decide whether that fact requires exempting the CAFE penalty from inflation adjustment.

[59] This conclusion applies with equal force to the $10 cap found in the EPCA provision that permits the Secretary of Transportation to increase the base penalty rate. *See* 49 U.S.C. § 32912(c)(1)(A)–(B).  To account for inflation, that cap must be increased to $25.  *See* 81 Fed. Reg. at 43,526.  Indeed, if the cap is not subject to the Improvements Act,

28

NHTSA argues that to the extent there is ambiguity as to whether the CAFE penalty constitutes a "civil monetary penalty," we should resolve it in favor of the agency's 2019 Final Rule, giving deference to the agency's interpretation under *Chevron* or, at least, *Skidmore*.[60] Because we have found no ambiguity in the statute, neither form of agency deference is implicated. But even if we agreed with NHTSA that the meaning of "civil monetary penalty" was ambiguous when the Inflation Adjustment Act was passed, any ambiguity would have been resolved when Congress enacted the Improvements Act, which re-used the phrase "civil monetary penalty" without alteration after NHTSA had consistently applied it to the CAFE penalty.[61] As the Supreme Court has instructed, "[w]hen administrative . . .

---

then EPCA's grant of discretion to the Secretary would be rendered a nullity as the penalty's new base rate of $14 is already above the cap's original $10 limit.

[60] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865–66 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

[61] *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) ("Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations."); *Haig v. Agee*, 453 U.S. 280, 297 (1981) (assuming congressional awareness and adoption of "longstanding

29

interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative . . . interpretations as well." [62]  Justice Frankfurter once said that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."[63]  It's also fair to say that when

---

administrative construction" of legislation enacted by prior congress where "[t]here is no evidence of any intent to repudiate" the construction); *Fed. Deposit Ins. Corp. v. Philadelphia Gear Corp.*, 476 U.S. 426, 437 (1986) ("When the statute giving rise to the longstanding interpretation has been reenacted without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (internal quotation marks omitted)).

[62]  *Bragdon*, 524 U.S. at 645; *see Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); *New York v. U.S. Dep't of Homeland Sec.*, Nos. 19-3591, 19-3595, mem. op. at 56–58 (2d Cir. Aug. 4, 2020) (considering the "settled meaning" of a statutory provision based on previous administrative and judicial constructions); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 322 (2012) ("If a statute uses words or phrases that have already received . . . uniform construction by . . . a responsible administrative agency, they are to be understood according to that construction.").

[63]  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947), *quoted in Stokeling v. United States*, 139 S. Ct. 544, 551 (2019); *see also Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006) ("We should assume that Congress legislated

Congress plants the same seed in the same soil, it can expect the same plant to grow.

By the time Congress enacted the Improvements Act in 2015, the term "civil monetary penalty" had a settled legal meaning — both in terms of its statutory definition generally and its application to the CAFE penalty specifically. The term was originally used in the Inflation Adjustment Act of 1990, which adopted the definition currently in use.[64] In its report to OMB following Congress's enactment of the Inflation Adjustment Act, NHTSA identified the CAFE penalty as a "civil monetary penalty."[65] Congress then reused that phrase — subject to the same definition — in the 1996 amendments that required agencies to increase their "civil monetary

---

against a background of law already in place and the historical development of that law." (internal quotation marks and ellipsis omitted)).

[64] Inflation Adjustment Act § 3(2), 104 Stat. at 890.

[65] OFF. OF MGMT. & BUDGET, CIVIL MONETARY PENALTY ASSESSMENTS AND COLLECTIONS: 1990 REPORT TO CONGRESS AND CIVIL MONETARY PENALTY INFLATION ADJUSTMENT REPORT Ex. 1 at 25, Ex. 2 at 25 (1991).

penalties" to account for inflation.[66] Most importantly, in 1997, NHTSA

promulgated a final rule that increased the base rate for the CAFE penalty

from $5 to $5.50 based on its application of the 1996 amendments.[67] Thus,

when Congress used the phrase "civil monetary penalties" for the third

time, in the 2015 Improvements Act, the term had already received a

particular administrative construction — that it encompassed the CAFE

penalty, despite its use of a formula, including multipliers and a credit

offset.[68] By the time of the 2015 enactment, any arguable question over

---

[66] Pub. L. No. 104-134, § 31001(s)(1), 110 Stat. at 1321-373.

[67] 62 Fed. Reg. at 5,168.

[68] The actions of other relevant entities after adoption of the "civil monetary penalties" definition in the Inflation Adjustment Act in 1990, and before enactment of the 2015 Improvements Act, were consistent with the view that the CAFE penalty is a "civil monetary penalty." For example, in 2003, the U.S. General Accounting Office (now the Government Accountability Office) cited the CAFE penalty as a civil monetary penalty that no longer created sufficient deterrence and needed an inflation adjustment. U.S. GENERAL ACCOUNTING OFFICE, AGENCIES UNABLE TO FULLY ADJUST PENALTIES FOR INFLATION UNDER CURRENT LAW 2, 29 (2003), gao.gov/assets/240/237592.pdf. A few years later, the Congressional Research Service highlighted the same issue, also identifying the CAFE penalty as a civil monetary penalty covered under the Inflation Adjustment Act. CURTIS W. COPELAND, CONG. RESEARCH SERV., ADJUSTMENT OF CIVIL MONETARY PENALTIES FOR INFLATION 9 (2008). Even the Alliance of Automobile Manufacturers and the Association of Global Automakers, which now comprise the intervenor, the Alliance for Automotive Innovation, conceded that the CAFE penalty was a "civil monetary

whether the CAFE penalty was a "civil monetary penalty" covered by the

Improvements Act had been settled in the affirmative.[69]

---

penalty" under the Improvements Act when they initially petitioned for reconsideration of the 2016 increase to the base penalty rate.

NHTSA draws our attention to only one instance in which an agency has not listed the CAFE penalty as a "civil monetary penalty": a 1988 study that the President's Council on Integrity and Efficiency submitted to the Senate. *See* OMB, Letter of Concurrence, at 6 & n.34 (July 12, 2019), whitehouse.gov/wp-content/uploads/2019/07/ NHTSA.pdf. But that study preceded adoption of the Inflation Adjustment Act in 1990 and therefore can hardly be considered an authoritative construction of that act.

[69] We add that *Chevron* deference to NHTSA's interpretation of the Improvements Act is, in any event, "clearly not warranted," because "the Act applies to all federal agencies, meaning [that] NHTSA has no special expertise in interpreting its language." *NRDC v. NHTSA*, 894 F.3d at 112 n.10. Moreover, NHTSA's authority to interpret EPCA does not provide reason to afford its interpretation *Chevron* deference because its interpretation of EPCA "limits the work of [the Improvements Act, which] . . . it does not administer." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018).

Nor do we owe *Chevron* deference to OMB's new interpretation of the Improvements Act. Although Congress delegated authority to OMB to "issue guidance to agencies on implementing the inflation adjustments required" under the Improvements Act, 28 U.S.C. § 2461 note sec. 7(a), OMB did not issue such formal guidance here. Instead, all OMB did was issue an informal opinion letter to the Secretary of Transportation. *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Opinion Letter (July 12, 2019). Such a letter does not carry the force of law, so it is not entitled to *Chevron* deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *see also Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016).

Finally, our conclusion that the CAFE penalty is a "civil monetary penalty" does not conflict with EPCA. NHTSA and the intervenor, Alliance for Automotive Innovation, argue that the Improvements Act does not apply to the CAFE penalty because its directive to increase civil monetary penalties conflicts with the limitations on penalty increases in EPCA. But as we have previously recognized, "[n]othing in EPCA contradicts or undermines th[e] mandate" in the Improvements Act to increase civil monetary penalties.[70] EPCA merely authorizes discretionary increases to the CAFE penalty base rate under certain conditions.[71] The penalty-increase provisions of the Improvements Act and EPCA "are capable of co-

---

[70] *NRDC v. NHTSA*, 894 F.3d at 112 ("In implementing the Improvements Act, Congress articulated purposes that transcended the confines of any given agency's regulatory functions . . . [and] ECPA does not contravene this government-wide policy.").

[71] *See* 49 U.S.C. § 32912(c)(1)(A) ("The Secretary of Transportation shall prescribe by regulation a higher amount for each .1 of a mile a gallon to be used in calculating a civil penalty . . . if the Secretary decides that the increase in the penalty . . . will result in, or substantially further, substantial energy conservation for automobiles . . . and . . . will not have a substantial deleterious impact on the economy of the United States, a State, or a region of a State.").

existence," and it is therefore our "duty" to interpret the provisions in a manner that renders "each . . . effective."[72]

**B. The Improvements Act did not authorize NHTSA to reconsider the economic effects of its rule outside the timeline specified by Congress.**

Having concluded that the Improvements Act mandates an inflation adjustment to the CAFE penalty, we now consider whether — in 2019 — NHTSA was permitted to reconsider the economic effects of the increase it had already promulgated in 2016. We reject NHTSA's argument that, at the time it issued the 2019 Final Rule, it was permitted to reverse the penalty increase on the grounds that the increase would create a "negative economic impact."[73]

The Improvements Act outlined a "highly circumscribed schedule for . . . penalty increases."[74] NHTSA maintains that although the Improvements

---

[72] *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003) (quoting *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001)).

[73] *See* 84 Fed. Reg. at 36,013.

[74] *NRDC v. NHTSA*, 894 F.3d at 109 (cleaned up).

Act includes a deadline for the publication of an interim final rule, "nothing in the statute imposes a deadline on any *final* rule following further comments or consideration in that interim final rule-making."[75] It is true that the Act permitted agencies to "adjust the amount of a civil monetary penalty by less than the otherwise required amount [for the initial catch-up adjustment] . . . after publishing a notice of proposed rulemaking and providing an opportunity for comment," so long as the agency met certain requirements.[76] But this provision did not give the agency an unlimited amount of time to reconsider its initial catch-up adjustment. The time-sensitive nature of the final rule is clear in the full context of the Improvements Act, which requires not only an interim final rule increasing each penalty by "no[] later than July 1, 2016," but also additional increases to each penalty by "no[] later than January 15 of every year thereafter."[77] In

---

[75] NHTSA Br. at 36 (emphases added and removed).

[76] 28 U.S.C. § 2461 note sec. 4(c).

[77] *Id.* § 2461 note sec. 4(a).

other words, the annual increases starting in 2017 would necessarily build on the initial catch-up adjustment. Thus, even if we agreed with NHTSA that the Improvements Act permitted reconsideration of the catch-up increase following its publication of an interim final rule, the window for that reconsideration was narrow and limited to the year 2016 — or more precisely, two weeks into the next year, before the next required increase due by January 15, 2017. As in *NRDC v. NHTSA*, we cannot here "read the Improvements Act to permit the very kind of indefinite delay that it was enacted to end."[78]

We need not reach the merits of NHTSA's conclusions regarding negative economic impact because it was not authorized to undertake this reconsideration at the time it did so.[79]

---

[78] 894 F.3d at 111.

[79] In light of our holding, we also need not reach the other arguments raised by the petitioners to challenge the 2019 Final Rule. *See, e.g.*, *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 171 n.18 (2d Cir. 2013).

## III.   Conclusion

In sum, we hold as follows:

1.   The CAFE penalty established pursuant to EPCA, 49 U.S.C. § 32912(b), is for a "specific monetary amount" and thus constitutes a "civil monetary penalty" for purposes of the Improvements Act, 28 U.S.C. § 2461 note sec. 3.  NHTSA did not act in accordance with law when it reached the contrary conclusion in its 2019 Final Rule and reversed its initial catch-up inflation adjustment.

2.   The Improvements Act provided a limited window of time for NHTSA to reduce the initial catch-up inflation adjustment to the CAFE penalty based on a conclusion that the increase would have a negative economic impact, pursuant to 28 U.S.C. § 2461 note sec. 4(c).  By 2019, that window had closed, and NHTSA acted in excess of its statutory authority when it reconsidered and reversed its prior increase of the CAFE penalty from $5.50 to $14, based on an assessment of economic consequences.

We therefore grant the petitions for review and vacate the 2019 Final Rule. As we have stated before: The Civil Penalties Rule, 81 Fed. Reg. 95,489, 95,489–92 (Dec. 28, 2016), raising the CAFE base penalty rate to $14, is now in force.[80]

---

[80] *See NRDC v. NHTSA*, 894 F.3d at 116.